# United States Court of Appeals
## For the First Circuit

No. 14-1007

UNITED STATES OF AMERICA,

Appellee,

v.

HILTON ALEXIS CORDERO-ROSARIO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpi, U.S. District Judge]

Before

Howard, Lipez, and Barron,
Circuit Judges.

José L. Nieto-Mingo, with whom Nieto Law Offices, José A. Pagán, and Pagán Law Offices were on brief, for appellant.
Francisco A. Besosa-Martínez, Assistant United States Attorney, with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 4, 2015

**BARRON, Circuit Judge.**   This appeal concerns a district court's decision to deny a sweeping motion to suppress evidence in a federal child pornography prosecution.   The defendant contends that all of the evidence that he seeks to suppress may be traced to two allegedly unconstitutional searches that the Puerto Rico police carried out before he was even under suspicion on the federal charges.

The defendant seeks first to suppress any evidence that was acquired in those two searches.   And we agree that, under the established precedent of the Supreme Court and our Circuit, the searches carried out by the Puerto Rico police did violate the Fourth Amendment and that any evidence that the government wishes to use that was acquired only from those searches must be suppressed.

The more difficult issue concerns the defendant's attempt to suppress the evidence that federal agents later acquired after receiving the consent of the defendant's then-wife to examine certain electronic devices taken from her and the defendant's home. The defendant contends that this evidence also must be suppressed because the federal agents initiated their investigation -- and thus carried out the consent-based examinations -- only after the Puerto Rico police supplied a tip that was premised solely on information the Puerto Rico police acquired from the two prior unlawful searches.

-2-

We have previously held that the taint from a prior unconstitutional search may render evidence obtained from a subsequent consent-based search illegal "fruits of the poisonous tree" that must be suppressed. See United States v. Navedo-Colón, 996 F.2d 1337, 1338-39 (1st Cir. 1993). Unfortunately, however, the record in this appeal contains little that would help us decide whether such suppression is required here. The District Court made no factual findings on the relationship between the searches the Puerto Rico police conducted and the subsequent federal investigation, which resulted in federal authorities obtaining the consent of the defendant's then-wife. Instead, the District Court ruled -- erroneously -- that the two searches the Puerto Rico police carried out did not violate the Fourth Amendment. For that reason, the District Court had no occasion to address whether those unlawful searches taint the evidence federal authorities later acquired pursuant to the consent the defendant's then-wife provided.

The parties do appear to ask us to resolve this issue on the basis of the record before us, notwithstanding its undeveloped state. But because the issue is so fact dependent, we vacate and remand so that the District Court may hold an evidentiary hearing to determine whether the Puerto Rico police's prior searches so tainted the evidence the federal agents later obtained pursuant to the consent that the defendant's then-wife supplied that such

evidence must be suppressed. If the District Court determines suppression is required, then the District Court also must determine what specific evidence in fact must be suppressed in consequence.

## I.

On February 4, 2011, Agent Noel Ramos-Ortíz, an officer in the Carolina Sexual Crimes Division of the Puerto Rico State Police, filed an affidavit with the Puerto Rico Court of First Instance. Agent Ramos filed the affidavit in support of his request for a warrant to search the apartment of Hilton Cordero-Rosario, the defendant in this case.[1]

The affidavit explained that Cordero was under investigation for having committed lewd acts with a minor, in violation of Puerto Rico law. See P.R. Laws Ann. tit. 33, § 4772(a). A Puerto Rico magistrate judge issued the warrant the same day Agent Ramos submitted it, and Agent Ramos then conducted a search of Cordero's apartment later that day. During that search, the police seized a desktop computer and other electronic equipment.

---

[1] We glean the facts as best we can from the sparse record before us and note that the defendant's motion to suppress and the parties' appellate briefing purport to provide some factual insight on the surrounding events. We emphasize, however, that under the circumstances of this case the District Court should feel free to explore fully the historical facts as it deems necessary.

Three weeks later, on February 25, 2011, and in connection with the same criminal investigation, Agent Ramos filed a second affidavit with the Court of First Instance. Agent Ramos again sought a warrant to search Cordero's apartment. A magistrate judge issued a warrant following this second request, and a search of Cordero's apartment ensued on February 26, 2011. The police conducted this second search in the presence of Cordero's then-wife, D.M.C., but not Cordero himself. The police seized various electronic devices not taken in the first search.

Following these searches, Agent Ramos's team determined that the seized materials, including the desktop computer obtained on February 4, contained images believed to be child pornography. Puerto Rico police informed federal law enforcement officials in Puerto Rico of what they had found.[2]

More than a month later, on April 11, 2011, after the Puerto Rico police had informed federal authorities about the images the Puerto Rico police had found, federal agents approached D.M.C. and apparently asked for her assistance in their investigation of her husband for federal child pornography violations. D.M.C. consented to the federal agents' examination of the family's desktop computer, which at that time was apparently

---

[2] It is not clear, however, precisely how or when the Puerto Rico police provided this information to federal authorities, precisely who from the Puerto Rico police did so, or precisely what was discussed.

still in the custody of the Puerto Rico police. D.M.C. also agreed to turn over other digital media in the home. Cordero was not present during this meeting between federal agents and his then-wife.

On the basis of the consent D.M.C. gave, federal law enforcement agents on May 2, 2011, performed their own forensic examination of the desktop computer. That examination revealed a number of sexually explicit photographs of a minor female. The minor depicted in these photographs was not the same minor female whose complaint of lewd acts had precipitated the initial searches of Cordero's apartment  The government conducted interviews with the minor who appeared in these images on May 12, 2011.

Then, on December 7, 2011, a federal grand jury in Puerto Rico indicted the defendant for twenty counts of production of child pornography (in violation of 18 U.S.C. § 2251(a)) and two counts of possession of child pornography (in violation of 18 U.S.C. § 2252(a)(4)(B)). Cordero entered a plea of not guilty on December 22, 2011. The grand jury then issued a superseding indictment that alleged, in substance, the same charges.

Cordero did not immediately enter a plea under the superseding indictment. Instead, on June 25, 2012, Cordero filed a motion to suppress. In that motion, Cordero sought to suppress "all the evidence that was obtained as a result of the execution of both" the February 4 and February 25 search warrants, as well as

-6-

the evidence that the federal agents had obtained pursuant to D.M.C.'s consent to the examination of the desktop computer and the other materials that she turned over to the federal agents.

According to Cordero's motion, the warrant affidavits filed with the Puerto Rico Court of First Instance failed to establish the probable cause necessary to support the two searches of his apartment on February 4 and February 26, respectively. Cordero also argued that these unlawful searches -- by leading to the discovery of the images that initiated the federal child pornography investigation -- required that all the evidence that federal law enforcement later obtained be suppressed as "fruit of the poisonous tree."

The District Court denied Cordero's motion to suppress. In doing so, the District Court did not wait for the government's response to Cordero's motion. Nor did the District Court hold an evidentiary hearing, as Cordero had requested. Instead, the District Court based its suppression ruling solely on the February 4 and February 25 affidavits. According to the District Court:

> Agent Ramos-Ortiz's application for search warrant states he is investigating a complaint regarding lewd and lascivious acts committed against minor P.C.M., who herself provided the information about the pornographic material in the defendant's computer. While possession of pornography in and of itself, may not be a state or federal crime, here, the possession pertains to an investigation of a sexual crime against a minor. The fact that the application for a search warrant is not drafted as elaborately as an FBI application does not do away with probable cause.

Cordero and the government then reached a plea agreement. Cordero pled guilty only to one of the two possession counts. That count was based on the material found on the hard drive of the desktop computer that the Puerto Rico police had seized on February 4 and that the federal authorities had later examined (with D.M.C.'s consent) after their April 11 interview with D.M.C. In return for Cordero's plea, the government agreed to allow Cordero to reserve the right to appeal the District Court's decision denying the motion to suppress.

Cordero now invokes that right. He contends that the District Court erred not only in denying his suppression motion outright, but also in not holding an evidentiary hearing on the suppression issue.

## II.

We begin with Cordero's most straightforward challenge, in which he seeks to suppress the evidence that the Puerto Rico police seized in the February 4 and February 26 searches. Cordero contends that the affidavits the police presented in support of the warrant requests were so lacking in the necessary indicia of probable cause that no reasonable magistrate judge could have issued a warrant based on those affidavits.

The government disagrees with Cordero, arguing that the warrant affidavits were sufficient. But the government goes on to argue that, even if the two warrant affidavits were insufficient,

-8-

the District Court was still correct not to suppress this evidence. And that is because, the government argues, the Puerto Rico police acted in good faith in relying on the issued warrants, and, in any event, the seized material would inevitably have been discovered through independent lawful means. We start with the threshold issue: whether the searches were conducted without probable cause.

**A.**

Under the Fourth Amendment, a law enforcement officer's application for a search warrant must "demonstrate probable cause to believe that . . . a crime has been committed," which is known as the "commission" element of the required probable cause showing. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999); see also United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999). In addition, the application must "demonstrate probable cause to believe that . . . enumerated evidence of the offense will be found at the place to be searched," which is known as the "nexus" element. Feliz, 182 F.3d at 86; see also Vigeant, 176 F.3d at 569.

Here, the defendant's challenge focuses on the nexus element. In determining whether this element is satisfied, "[t]he task of the issuing magistrate is . . . to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

-9-

With respect to how strong that showing must be, "the facts presented to the magistrate need only 'warrant a reasonable man of caution' to believe that evidence of a crime will be found." Feliz, 182 F.3d at 86 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). In conducting our review, moreover, "we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no 'substantial basis' for concluding that probable cause existed." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (quoting Feliz, 182 F.3d at 86).

To determine whether there was a substantial basis for finding a nexus, it is important to identify at the outset the crime under investigation. As the government rightly points out, Cordero was not under investigation for federal offenses involving the possession or production of child pornography at the time the affidavits were filed. He was instead under investigation for committing lewd acts against a minor in violation of Puerto Rico law. Thus, the question that matters with respect to the adequacy of the two affidavits is not (as Cordero at times contends in his briefs) whether the affidavits supported a search for evidence of the federal child pornography offense -- which the affidavits did not purport to show. The question is whether the affidavits provided a "'substantial basis' for concluding that probable cause existed" that evidence of the crime of lewd and lascivious acts under Puerto Rico law would be found. Id. Even with our focus

-10-

trained solely on that question, however, we conclude that neither affidavit provides enough supporting information on that issue.

Agent Ramos filed the first affidavit in support of a search warrant in the case against Cordero on February 4, 2011. That affidavit stated:

> That on February 4, 2011, I was assigned the complaint 2011-8-316-00841, on lewd actions.
>
> I understand and conclude from the investigation carried out by me in this case and in accordance with the interview of the injured party P.C.M., minor, that in apartment 2704 of Jardines de Parque Escorial in Carolina, Puerto Rico, there is a desktop computer in which there is pornographic material . . . .

According to the government, "because agents were . . . investigat[ing] . . . accusations of lewd and lascivious acts against a minor, there was a fair probability that any pornographic material found in Cordero-Rosario's computer would constitute evidence of a crime." Appellee Br. 18. Thus, the government contends, the affidavit did all that it needed to do.

We do not agree. Cordero was not being investigated for possession of illegal pornography. He was being investigated for committing certain lewd acts. The affidavit, however, supplies no basis for connecting the pornography that was the object of the search to that particular offense, which, in its nature, does not necessarily involve the use of pornography at all. In this regard, the affidavit does not state at any point that the alleged lewd and lascivious acts were carried out in a manner that involved the use

-11-

of pornography, which is on its own legal to possess. In fact, the affidavit says nothing at all about why the existence of otherwise lawful pornography on a home desktop computer would be relevant to this particular criminal investigation. Nor does the affidavit state or even intimate that the "pornographic material" in question involved the injured minor, or any minor at all. Cf. United States v. Joubert, 778 F.3d 247, 253 (1st Cir. 2015) (upholding a search based on an affidavit that more closely tied the evidence sought to the alleged offense). And the government asks us, in assessing the sufficiency of the predicate for both warrants, to look only within their four corners and those of the attached affidavits.[3]

As the government conceded at argument, moreover, the affidavit also does not state a fact that the District Court seems to have assumed: that the minor who is alleged to have been the victim of the crime told the police about the "pornographic material" on the computer. Such a statement in the affidavit would perhaps permit an inference that pornography had been used by the defendant in the minor's presence in such a way as to be connected

---

[3] After oral argument, the government filed a 28(j) letter attaching two Puerto Rico court decisions examining the validity of the warrant affidavits at issue in this case. The letter reports that the decisions reference material beyond the face of the affidavits in finding them supported by probable cause. We decline to consider these belatedly offered materials, which the government did not discuss or even reference before oral argument in this case. See United States v. Barbour, 393 F.3d 82, 94 (1st Cir. 2004) (new issues ordinarily cannot be raised in 28(j) letters).

to the offense.[4]  But, again, the affidavit does not provide even that much of a link between the evidence identified and the crime being investigated.  Instead, the affidavit simply states that Agent Ramos's belief about what would be found in Cordero's apartment is "in accordance with" his interview with the minor. But an investigating officer's otherwise unsupported assertion that evidence of criminal activity will turn up at a given place could be "in accordance with" an interview even if the interviewee said nothing at all about the material that the officer asserts to be evidence of an offense.

The February 4 affidavit thus predicates its representations about what would be found in Cordero's apartment -- and its relation to the criminal offense under investigation -- solely on Agent Ramos's assertion that, due to his "investigation," he is of the view that such material would be there and that it would constitute "evidence of the offense."  And while Agent Ramos does relay that his investigation included his interview with the "injured party," he offers no other supporting facts or details about what he learned from that interview, and thus none that draw the link between the object of the search -- the home computer containing pornographic material -- and the offense itself.

---

[4] But perhaps not.  Even with such a direct statement about what the minor had said, the affidavit would still not set forth any facts directly to the effect that the pornography had in fact been used in the crime.

The affidavit, in other words, was conclusory as to all the key points concerning nexus. And such a conclusory affidavit is plainly not sufficient to establish the necessary probable cause. Gates, 462 U.S. at 239 (noting that issuing a warrant supported by "mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" would be contrary to rights secured by the Fourth Amendment); Spinelli v. United States, 393 U.S. 410, 418 (1969) ("[A] simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause."), abrogated on other grounds by Gates, 462 U.S. 213; Nathanson v. United States, 290 U.S. 41, 44-47 (1933) (affiant's statement that "he has cause to suspect and does believe that" liquor illegally brought into the United States was located on certain premises was insufficient to support a finding of probable cause necessary for the issuance of warrant); Vigeant, 176 F.3d at 569 (warrant affidavit that contained "conclusory statements of the affiant that," though they "might otherwise have helped create probable cause," were "entirely without factual support" failed to support probable cause).

The affidavit relating to the second search warrant is even less detailed. This affidavit is thus even less capable of establishing the needed probable cause.

Filed on February 25, 2011, the second affidavit stated only as follows:

> That as part of the investigation of complaint 2011-8-316-00841, on lewd actions and pornography, on February 4, 2011, I carried out a Search Warrant, issued by the Honorable Judge Madeline Vega, against the residence located in apartment 2704 of the complex Jardines del Parque Escorial, in Carolina, where I seized a grey desk top computer tower with clear lid on one of its sides, brand Gigabyte, serial number 24ZFS-CA1ATS-01R.

> Continuing the course of this investigation, we understand that there is important evidence in said residence that was not obtained in the first search, whereby we very respectfully request this Honorable Court to issue a Search and/or Seizure Warrant against the above-captioned residence indicated in the caption and in the content of this Sworn Statement, in all its dependencies and/or inside levels, in search of [various digital devices].

Other than informing the magistrate judge that Cordero was under investigation and that Cordero's apartment had previously been searched, this affidavit provided only the bare assertion that "important evidence" would be found in the stated location. And the affidavit made that assertion without identifying any foundation for that belief or offering any clue as to what the "important evidence" might be.

In other words, the affidavit told the magistrate judge nothing more than that there was an ongoing investigation of the person whose premises were to be searched, that the premises had been searched before, and that the police believed something of importance would be found if the place were searched again. The

authority we have already cited, establishing that conclusory assertions in an affidavit from law enforcement cannot supply the kind of probable cause needed to secure a warrant, suffices to demonstrate the constitutional inadequacy of this second warrant affidavit as well.

**B.**

The government responds that, "even assuming arguendo that the evidence was seized pursuant to an invalid warrant," the police still acted in good faith in relying on the warrants the Puerto Rico magistrate judge had issued. Appellee Br. 20-21. Under this "good faith" exception to the exclusionary rule -- the applicability of which we review de novo,[5] see United States v. McMullin, 568 F.3d 1, 5 (1st Cir. 2009) -- the evidence from an illegal search need not be suppressed if the police officer who conducted the search "acted in objectively reasonable reliance on a search warrant, issued by a neutral and detached Magistrate, that later was determined to be invalid." Arizona v. Evans, 514 U.S. 1, 11 (1995); see also United States v. Leon, 468 U.S. 897, 919-20 (1984) ("[W]here the officer's conduct is objectively reasonable, 'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way'" (quoting Stone v. Powell, 428 U.S. 465, 539-40 (1976) (White, J., dissenting))).

---

[5] Because it found both warrants supported by probable cause, the District Court did not reach the issue of whether the good faith doctrine applied.

Here, however, Agent Ramos was relying on warrants that were constitutionally inadequate because of his own failure to provide the facts in the affidavits that could have supported their issuance. And, again, the government does not ask us to look outside the four corners of the warrants and the attached affidavits. We thus do not see how, on this record, the good faith doctrine may permit an exception to the exclusionary rule.

From all that we can tell, Agent Ramos sought the warrant solely on the basis of his own conclusory assertions. And those assertions, we add, do not even assert a nexus between the object of the search and the crime under investigation, let alone provide enough facts to establish probable cause to believe such a nexus existed. In such circumstances, the police cannot be said to be acting reasonably in then relying on a warrant that reflects those very same glaring deficiencies. See Leon, 468 U.S. at 899 ("Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."); United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999) (similar). And that is especially so when the deficiencies arise from the failure of the agent conducting the search to provide the required supporting information in the affidavit. See 1 Wayne R. LaFave, Search And Seizure: A Treatise On The Fourth Amendment § 1.3(f), at 91 (5th ed. 2012) (Leon does

-17-

"not allow law enforcement authorities to rely on an error of their own making" (citation omitted)); see also United States v. Fuccillo, 808 F.2d 173, 178 (1st Cir. 1987) ("good faith" exception not applicable where police "were reckless in not including in the affidavit information which was known or easily accessible to them"). The good faith exception to the exclusionary rule thus does not apply in this case.

## C.

That brings us to the government's final argument for why the evidence obtained in the searches conducted by the Puerto Rico police should not be suppressed. Under the so-called inevitable discovery doctrine, the exclusionary rule does not bar the use of unlawfully obtained evidence in "any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred." United States v. Scott, 270 F.3d 30, 42 (1st Cir. 2001).

The government argues it was inevitable that law enforcement eventually would lawfully have discovered the images of child pornography found on Cordero's home computer. To make this argument, the government contends that the police would have inevitably discovered the material at issue in this case "in

-18-

searching the computer located in [Cordero]'s home."  Appellee Br. 19.

That may well be true -- if, that is, the Puerto Rico police or the federal agents would have possessed the computer at all.  But with regard to why it was inevitable that, even absent the Puerto Rico police's unconstitutional searches, the computer would have been acquired, the government makes no argument.  Yet it is that explanation that the government must supply if it wishes to rely on the inevitable discovery doctrine here, as it is the computer that was obtained on the basis of an insufficiently supported warrant.

This case is therefore distinguishable from United States v. Crespo-Ríos, 645 F.3d 37 (1st Cir. 2011), on which the government relies for its inevitable discovery argument.  In Crespo-Ríos, it was "not disputed" that there existed probable cause to support the search of the defendant's computer.  645 F.3d at 42-43.  Here, by contrast, the warrants on which the Puerto Rico police relied in acquiring the computer were legally deficient. Accordingly, we have no basis for concluding that the government can meet its burden of satisfying the inevitable discovery test. See United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994) (rejecting an inevitable discovery argument where the government had not shown that, absent the Fourth Amendment violation, "the

officer could have taken 'legitimate custody'" of the vehicle in which the evidence was found).

## D.

As a result of the foregoing analysis, we hold that the Puerto Rico police's February 4 and February 26 searches were undertaken in violation of the Fourth Amendment and that no exception to the exclusionary rule applies to evidence that was obtained only during those two searches. Much of the evidence against Cordero, however, including the evidence specifically described in his conditional plea agreement, was found in a "subsequent forensic examination" after federal agents became involved in the case. We thus must consider whether the federal agents' investigatory efforts provide a separate basis for the use of such evidence against Cordero. And that brings us to Cordero's final contention.

## III.

In seeking to suppress all of the evidence that the federal agents obtained pursuant to the examination of the home computer and the other electronic devices that his then-wife permitted the authorities to examine, Cordero offers two distinct arguments. We now consider those arguments in turn.[6]

---

[6] In challenging the effectiveness of D.M.C.'s consent for purposes of introducing the evidence to which it led, Cordero does not contest in this appeal that D.M.C.'s consent was voluntary.

Cordero's first argument is that his then-wife's consent did not suffice to permit the federal authorities' search because the federal authorities neither sought nor received consent from Cordero himself.  In making this argument, Cordero recognizes that D.M.C., as his wife at the time, "possesse[d] common authority over [their] . . . effects" and was thus capable of consenting to a search of such items.  See Georgia v. Randolph, 547 U.S. 103, 108 (2006) (quoting United States v. Matlock, 415 U.S. 164, 170 (1974)).  In general, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant."  Matlock, 415 U.S. at 171.  Instead, "the consent of one who possesses common authority over premises or effects" generally "is valid as against the absent, nonconsenting person with whom that authority is shared."  Id.; see also id. at 169-77 (allowing admission of evidence found in a diaper bag in a bedroom closet following  a search conducted pursuant to the consent of one with common authority over the bedroom).

This rule follows because, as the Supreme Court has explained, common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes."  Id. at 171 n.7.  In consequence, it is "reasonable to recognize that any of the co-inhabitants has the right to permit

the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id.

But Cordero contends that even though D.M.C. apparently had "common authority" over the computer and other electronic devices that the federal authorities examined, his then-wife's consent still could not substitute for his own because he "was free on bail and available at that time." Appellant Br. 48. Cordero thus argues that the evidence the federal authorities obtained pursuant to D.M.C.'s consent must be suppressed because, on the facts of this case, her consent was no substitute for his.

But this is not the law. Under Georgia v. Randolph, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." 547 U.S. at 121. By contrast, "the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Id.

Cordero does argue that federal agents, by going directly to D.M.C. when he was not present, effectively did an end run around Randolph. That is because, Cordero implies, the federal agents knew that he would have refused to give consent if asked, and thus they avoided asking.

But the Supreme Court made clear in Randolph that even if a defendant were nearby and available to give consent, the

authorities were entitled to seek out the consent of his wife, as she had common authority. See id. at 121-22. And further, the Supreme Court made clear after Randolph that law enforcement authorities may pursue this same approach even when the nearby potential objector has previously declined to give consent. See Fernandez v. California, 134 S. Ct. 1126, 1133-34 (2014) (noting that Justice Breyer provided the "decisive" fifth vote for the majority in Randolph, and stressing that the Court's opinion in Randolph "went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present"); see also Randolph, 547 U.S. at 126 (Breyer, J., concurring) ("The Court's opinion does not apply where the objector is not present 'and object[ing].'" (quoting Randolph, 547 U.S. at 121 (majority opinion))). Thus, Cordero's mere availability -- and asserted inclination to object to a search if asked -- provides no basis for not giving effect to his then-wife's actual consent.

## B.

Cordero's second ground for arguing that the evidence obtained pursuant to D.M.C.'s consent must be suppressed has more force. According to Cordero, the federal government sought to obtain his then-wife's consent only due to a tip from Puerto Rico police that was itself the result of the Puerto Rico police's prior unlawful searches. Cordero thus contends that the evidence federal authorities obtained pursuant to the consent-based examinations was

necessarily "tainted" by the earlier unlawful searches that the Puerto Rico police conducted. And, for that reason, Cordero argues, all such evidence must be suppressed as illegal "fruits" of those prior unconstitutional searches.

In general, "[t]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." United States v. Camacho, 661 F.3d 718, 729 (1st Cir. 2011) (quoting New York v. Harris, 495 U.S. 14, 19 (1990)). By contrast, "[s]uppression is not appropriate . . . if 'the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint.'" Id. (quoting Segura v. United States, 468 U.S. 796, 805 (1984)).

"The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Brown v. Illinois, 422 U.S. 590, 609 (1975) (Powell, J. concurring); see also Segura, 468 U.S. at 804 (explaining that the exclusionary rule "'extends as well to the indirect as the direct products' of unconstitutional conduct" (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963))). In a similar vein, the Supreme Court has suggested that the key inquiry in cases seeking to suppress the indirect fruits of prior illegal law enforcement conduct concerns

-24-

"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488 (quoting John MacArthur Maguire, Evidence of Guilt 221 (1959)).

The classic case presenting this type of issue arises after a defendant seeks to suppress his confession on the ground that he made it following some prior unlawful search or seizure. See, e.g., Harris, 495 U.S. at 16-17 (defendant made an inculpatory statement at a police station after the police had violated the Fourth Amendment by entering the defendant's home without a warrant and without his consent); Brown, 422 U.S. at 592 (defendant made inculpatory statements after being arrested without probable cause or warrant). And, in such a case, a number of considerations are ordinarily relevant to the taint inquiry -- namely, (1) the time that elapsed between the underlying illegality and the later acquisition of the evidence at issue; (2) the presence or absence of intervening circumstances between those points in time; and (3) the purpose and flagrancy of the official misconduct in question. Brown, 422 U.S. at 603-04; accord Camacho, 661 F.3d at 729.

In our case, the federal authorities obtained the digital evidence against Cordero following the consent of his then-wife to examine various electronic devices taken from his home. According

to the government, the fact that the federal agents' examination of the electronic devices was premised on the then-wife's voluntary consent effectively immunizes from suppression the evidence they obtained as a result.

We disagree. In United States v. Navedo-Colón, we held that courts must determine whether the causal link between a prior unlawful search and consent (voluntary though it may have been) to a subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed.[7] 996 F.2d at 1339. Indeed, we emphasized the importance of determining whether the prior illegality "significantly influenced" or "played a significant role" in the subsequent consent. Navedo-Colón, 996 F.2d at 1339; see also United States v. Maldonado-Espinosa, 968 F.2d 101, 103-04

---

[7] That holding is in accordance with the views of nearly all the other Circuits. See, e.g., United States v. Murphy, 703 F.3d 182, 190 (2d Cir. 2012); United States v. Hill, 649 F.3d 258, 268-70 (4th Cir. 2011); United States v. Meece, 580 F.3d 616, 619-20 (7th Cir. 2009); United States v. Alvarez-Manzo, 570 F.3d 1070, 1077 (8th Cir. 2009); United States v. Jaquez, 421 F.3d 338, 341-42 (5th Cir. 2005); United States v. Washington, 387 F.3d 1060, 1072-73 & n.12 (9th Cir. 2004); United States v. Chanthasouxat, 342 F.3d 1271, 1280-81 (11th Cir. 2003). And, so far as we are aware, even the Tenth Circuit -- which previously had decided that "'voluntariness' for Fourth Amendment consent satisfies the Wong Sun standards," United States v. Carson, 793 F.2d 1141, 1150 (10th Cir. 1986) -- now analyzes this issue as we do. See United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994) (noting that Carson misstated the law of that Circuit, and "reiterat[ing] that not only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent"); see also, e.g., United States v. Fox, 600 F.3d 1253, 1257 (10th Cir. 2010) (relying on and applying Melendez-Garcia's framework for analyzing this issue).

(1st Cir. 1992); United States v. Race, 529 F.2d 12, 15 (1st Cir. 1976).  Of course, here, unlike in Navedo-Colón, the defendant is seeking to suppress evidence obtained pursuant to consent supplied not by himself but by a third party -- namely, the defendant's then-wife, D.M.C.  See Navedo-Colón, 996 F.2d at 1338.  But the fact that the prior unlawful searches by the Puerto Rico police led the federal authorities to a third party who then consented does not in and of itself show that the taint and exploitation concern simply disappears from view, as our decision in United States v. Finucan, 708 F.2d 838 (1st Cir. 1983), shows.

There, the defendants -- a bookkeeper at a used car dealership and the dealership's owner, respectively -- sought to suppress (among other things) evidence obtained from interviews the authorities conducted with other car dealers.  Finucan, 708 F.2d at 840-41.  Those interviews took place only after the authorities conducted a previous unlawful search of one of the defendants' homes.  Id. at 841-43.  In arguing against the suppression of the evidence obtained from the interviews, the government claimed that the Supreme Court's decision in United States v. Ceccolini, 435 U.S. 268 (1978), "precludes suppression of documentary evidence later acquired from the dealer interviews," because "the Court in Ceccolini declined to treat a witness's voluntary testimony as derivative of an illegal search or seizure."  Finucan, 708 F.2d at

-27-

843; see also Ceccolini, 435 U.S. at 277-88.  But we rejected that contention.

We explained that Ceccolini "stress[ed] our adversary system's preference for live testimony," a factor not presented by a case seeking "not rejection of live testimony but rather suppression of documents obtained from third parties."  Finucan, 708 F.2d at 843; see also United States v. Hughes, 279 F.3d 86, 89 (1st Cir. 2002) (explaining that the Supreme Court "has been especially reluctant to suppress . . . fruits where they are not objects or documents but live witnesses who could testify voluntarily and cast light on a range of issues").  And thus, we explained, although "the intervening role of third parties should be considered in determining whether documentary evidence was discovered independently of an illegal search or seizure, it is but one of the factors to be weighed."[8]  Finucan, 708 F.2d at 843-44 (citation omitted).

_____

[8] Although we did not make the point in Finucan, even Ceccolini declined to accept the government's invitation to adopt what amounted to "a per se rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment."  Ceccolini, 435 U.S. at 274-75.  The Court instead explained that although in some cases "the illegality which led to the discovery" of the third party who agreed to testify at the defendant's trial may "not play any meaningful part in the witness' willingness" to appear, that might not always be the case.  Id. at 277.  Ceccolini thus examined what role the illegal searches that had been conducted by the local police in that case played in leading the federal authorities to the witness whose testimony the defendant sought to exclude.  See id. at 273-80.

-28-

Among the factors we deemed relevant to the suppression issue in Finucan was whether, "[a]bsent the illegal search, the investigators [would] have known the identity of all of the third parties [or] what to ask them." Id. at 844. In that regard, we considered whether "the government anticipated that the illegal search would help lead it to the other dealers and documents," and whether "the third parties would have come forward on their own had the investigators not sought them out." Id.

With this precedent in place, the success of Cordero's suppression motion turns on whether the evidence obtained pursuant to D.M.C.'s voluntary consent was tainted by the prior unlawful searches by the Puerto Rico police. But that inquiry, as we have previously said, is necessarily highly fact dependent and "amorphous." Hughes, 279 F.3d at 89. The relevant considerations might include the ones we focused on in Finucan, as well as the three factors Brown articulated, which courts have applied in cases involving motions to suppress allegedly tainted evidence acquired pursuant to third parties granting consent to searches. See, e.g., United States v. Hill, 649 F.3d 258, 267-68 (4th Cir. 2011); see also State v. Lane, 726 N.W.2d 371, 380-92 (Iowa 2007) (discussing numerous considerations in addition to the Brown factors in fruit of the poisonous tree case involving third-party consent). Balancing these factors will illuminate the extent of attenuation

in this case, and, along with it, the deterrence value of excluding evidence derived from D.M.C.'s consent.

Because the inquiry "require[s] the particular circumstances of [the] case to drive the analysis," Lane, 726 N.W.2d at 383, we decline to undertake it now. The District Court never considered any of the relevant factors -- or made findings with respect to them -- for the simple reason that it held that the searches by the Puerto Rico police did not violate the Fourth Amendment. Thus, we lack sufficient information to determine whether D.M.C.'s consent was obtained by exploitation of the underlying illegality. As those are facts that may be discernible in an evidentiary hearing, we thus vacate and remand so the District Court in the first instance may consider the factors that Brown and Finucan identify.

## IV.

For the foregoing reasons, we vacate the District Court's suppression ruling. On remand, if the District Court should find that the Puerto Rico police's unlawful searches did not taint the federal authorities' consent-based search, then the District Court must decide which, if any, of the government's evidence stemmed solely from the Puerto Rico police's searches. If, however, the District Court should decide the taint issue in Cordero's favor, then the District Court must decide which, if any, evidence the government seeks to introduce must be suppressed in consequence of

that tainted relationship.  But given that those are issues about which we lack sufficient facts to determine, the District Court should only decide them following an evidentiary hearing on the matter.