# United States Court of Appeals
## For the First Circuit

No. 14-1617

UNITED STATES OF AMERICA,

Appellee,

v.

ERNESTO MONELL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Kayatta, Selya, and Dyk*,
Circuit Judges.

Jonathan Shapiro, with whom Harley C. Racer and Shapiro, Weissberg & Garrin, LLP, were on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

September 2, 2015

---

* Of the Federal Circuit, sitting by designation.

**KAYATTA**, **Circuit Judge**.    Ernesto Monell ("Monell") appeals from his conviction and sentence for one count of being a felon in possession of a firearm and ammunition and for one count of possessing with intent to distribute cocaine base.  His primary challenge on appeal is to the warrant used by police to search his apartment.  Monell also raises several other issues from his trial and sentencing.  After careful consideration, we affirm the district court's judgment in full.

## I.  Background[1]

On February 16, 2012, police officers of the Fall River, Massachusetts, Police Department, executed a warrant to search an apartment suspected of belonging to a man known to the officers only as "Ness."  Inside the apartment, officers found Monell, who matched the physical description of "Ness."  One of the officers witnessed Monell placing a handgun on top of a refrigerator as the officers broke down the apartment door.  After arresting Monell, officers seized the loaded handgun on the refrigerator, along with a dismantled shotgun, two shotgun rounds, 37 small bags of crack cocaine, digital scales, and materials used as drug packaging.  Officers also found, among other items, a Massachusetts driver's license for Ernesto Monell, envelopes addressed to "Ernesto" but

---

[1] We provide only enough background to frame the issues on appeal, reserving a fuller recitation of the facts relevant to each issue for our subsequent discussion of that issue.  See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015).

containing letters written to "Ness," photographs of Monell with members of the Bloods street gang, and three cell phones.

A grand jury issued an indictment charging Monell with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (count one) and possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count two). Monell filed several unsuccessful motions before trial, including a motion to suppress evidence seized from the apartment, a motion to reconsider the denial of the initial motion to suppress, and a motion in limine to preclude the testimony of the prosecution's proposed expert witness on drug distribution.

During the six-day trial, the government introduced many of the items seized during the search to establish that Monell lived in the apartment and that he possessed the handgun, ammunition, and drugs. The government also put on an expert on drug distribution. In his defense, Monell argued that the government failed to establish that he, and not someone else living in the apartment, possessed the gun, ammunition, and drugs. To support his theory, Monell called his mother as a witness, who testified that she once visited Monell at the apartment, where she saw other individuals who remained in the apartment after she left with Monell.

The jury convicted Monell of both counts. The district court sentenced Monell to 262 months in prison on count one and 240 months on count two, to be served concurrently. In this timely appeal, Monell challenges (1) the denial of his motion to suppress; (2) the government's peremptory strike of an African-American juror; (3) the testimony of the government's expert witness on drug distribution; (4) the potential admission of rebuttal evidence if Monell called one of his proposed witnesses; and (5) his sentence.

## II.  Analysis

### A.  Motion to Suppress Evidence from the Apartment

Monell renews his challenge to the search warrant, claiming that the warrant lacked probable cause, and that the good-faith exception to the exclusionary rule should not apply. His argument relies primarily on a discrepancy between the criminal conduct described in the supporting affidavit (illegal use of a firearm) and the items to be searched for (evidence of illegally possessed firearms). In reviewing the denial of a motion to suppress, we review the district court's ultimate probable cause and good faith determinations de novo. United States v. Brunette, 256 F.3d 14, 16-17 (1st Cir. 2001). We review the district court's factual findings for clear error. United States v. Woodbury, 511 F.3d 93, 96 (1st Cir. 2007).

## 1. Relevant Background

On February 16, 2012, Detective William Falandys ("Detective Falandys") applied for and received a no-knock warrant to search apartment number four in a multi-unit dwelling at 696 North Main Street in Fall River. The primary evidence in support of probable cause for the search came from two confidential informants, whose information was set forth in Detective Falandys's attached and incorporated affidavit. The first confidential informant ("CI-1") had previously provided information that led to at least two arrests and the seizure of marijuana and cocaine. In the week before the warrant application, CI-1 had given Detective Falandys the following information about the resident of apartment four at 696 North Main Street (known to CI-1 only as "Ness"):

- Ness "is a member of the Bloods [s]treet gang";

- Ness "has threaten[ed] individuals in the area to further his gang[']s activity";

- Ness "was involved in an incident where 'Ness' struck an individual with a firearm";

- Ness possessed a shotgun, rifle, and bulletproof vest;

- Within the previous 72 hours, CI-1 had seen "two rifle type firearms against a wall in the apartment."

- 5 -

CI-1 also showed Detective Falandys the apartment building and described the location of apartment four within the building, which was later confirmed by another officer.

The second confidential informant ("CI-2") had spoken to another police officer, who relayed CI-2's information to Detective Falandys. The affidavit provided no information about CI-2's track record as an informant. Within the prior week, CI-2 had seen someone named "Ness" "point a firearm at an individual in the area of 696 North Main Street." Both CI-1 and CI-2 gave similar physical descriptions of "Ness," though they did not provide his full name.[2] Detective Falandys stated that he had "exhausted all means necessary to identif[y] the identity of 'Ness' without compromising this investigation."

Detective Falandys also listed his law enforcement training and experience, primarily as a narcotics investigator, including experience "cultivat[ing] confidential informants" and "participat[ing] in the execution of numerous (no less than two hundred) search warrants." Based on his training and experience, and the information from the CIs, Detective Falandys "believe[d] firearms arms [sic], are being stored in apartment 4." The

---

[2] CI-1 described "Ness" as a "light skin black male, approximately 6'0 tall between 190-200 lbs" who wore eyeglasses. CI-2 described "Ness" as a "black male, approximately 6'0 tall between medium build [sic] with wire frame glasses."

- 6 -

magistrate signed the warrant, and Detective Falandys executed the search warrant later the same day.

Before trial, Monell filed a motion to suppress evidence found in the apartment on the basis that the warrant was not supported by probable cause. The district court denied the motion. The court concluded that the affidavit furnished probable cause that the search would uncover evidence of the Commonwealth crimes of assault with a dangerous weapon and use of a firearm during commission of a felony, although the district court acknowledged that "the evidence here was thin," and only enough for "a borderline or marginal case from a probable cause standpoint." The district court also found that the good faith exception to the exclusionary rule would apply in any event.

After a change of defense counsel, Monell filed a motion to reconsider the suppression ruling. In response to further briefing, the district court revised its earlier ruling. The district court determined that the search warrant was not supported by probable cause because it authorized a search for evidence of a crime for which probable cause was lacking: illegal possession of firearms. In particular, the affidavit contained no information that Monell was prohibited from possessing firearms. The district

- 7 -

court concluded nonetheless that the good faith exception applied, and therefore denied Monell's motion.[3]

### 2. Analysis

We begin our analysis by rejecting Monell's contention that the warrant affidavit did not adequately establish the reliability of the information supplied by the two confidential informants. CI-1 had previously provided information found to be accurate in at least two other arrests. See United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996) ("[S]uch an indicium of reliability may itself be sufficient to bulwark an informant's report."). Though the officer's affidavit did not provide a track record for CI-2, the mutual corroboration of the two CIs' stories--the location of the events, the physical description of "Ness," and the firearm-involved nature of the activity--served to bolster the reliability of the information provided by each of them. See id. ("[C]onsistency between the reports of two independent informants helps to validate both accounts.").

---

[3] In addition to assault with a dangerous weapon, the government argues that the affidavit supported probable cause of two other crimes. The first is possession of a firearm during commission of a felony under Mass. Gen. Laws ch. 265, § 18B, though the government does not articulate which felony it thinks Monell committed. The second crime, mentioned for the first time in a footnote in the government's brief, is illegal storage of a firearm under Mass. Gen. Laws ch. 140, § 131L. For simplicity, we focus our treatment not on these two crimes, but on assault with a dangerous weapon.

That brings us to the substance of the facts collectively supplied by the two informants. As the district court observed, those facts supplied probable cause to believe that a person named "Ness" residing in apartment four at 696 North Main Street had committed assault with a firearm. See Mass. Gen. Laws ch. 265, § 15B; Commonwealth v. Melton, 763 N.E.2d 1092, 1096 (Mass. 2002) (crime of assault with a dangerous weapon consists of attempted battery or immediately threatened battery perpetrated by means of a dangerous weapon). Accordingly, a magistrate would have had a substantial basis to think that the affidavit supported probable cause to search for evidence of assault with a dangerous weapon in apartment four. See United States v. Joubert, 778 F.3d 247, 252 (1st Cir. 2015) ("The reviewing court's duty is 'simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) ("A warrant application must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched . . . ."). And such evidence would plainly include guns--whether legally possessed or not--and evidence of access to guns.

The warrant as issued did indeed authorize a search for guns "used as the means of committing a crime." The complication

- 9 -

that gives rise to the main thrust of this appeal is that the warrant authorized a search only for "illegally possessed" weapons and evidence that would show "Ness" had such weapons. In this respect, the warrant was less broad than it might have been. That diminished breadth, moreover, was a product of Detective Falandys's apparent--and mistaken--belief that the facts reported by the confidential informants established probable cause to believe that "Ness" committed the crime of illegally possessing a gun. That apparent belief was clearly wrong because there was no evidence at the time that "Ness" had no right to possess a gun, a necessary element of the crime. See, e.g., 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm by a felon). In short, the detective had probable cause to search "Ness's" apartment for firearms that might bolster a charge of assault or battery with a firearm, but he crafted the warrant application to search for evidence of another crime (illegal possession of firearms) for which the detective lacked any evidence of an essential element (that "Ness" was unable to lawfully possess a gun).[4]

_____

[4] As requested in the application, the warrant authorized a search of the apartment for the following items:

> Any and all illegally possessed assault weapons, machine guns, firearms, shotguns, ammunition, feeding devices, and Any paraphernalia, or instrumentalities, related to the use, sales, manufacture, defacement, and distribution, of said illegal weapons, and all monies or records, printed or electronic,

It is difficult to see why such an error in identifying the criminal law that is violated by the conduct described in the affidavit necessarily renders the warrant invalid. Cf. Whren v. United States, 517 U.S. 806, 813 (1996) (arrest is valid if supported by probable cause of offense X, even if the officer made the arrest with the goal of finding evidence of offense Y). In assessing the validity of a warrant, we generally apply an objective test, asking whether the facts constitute probable cause of a crime, rather than whether the officer thought they did. See United States v. Silva, 742 F.3d 1, 8 (1st Cir. 2014) ("In evaluating probable cause, a court looks 'at the objective facts, not at the actors' subjective intent.'" (quoting United States v. Sanchez, 612 F.3d 1, 6 (1st Cir. 2010)). It is even more difficult to see why the officer's limitation on the types of guns and gun-related evidence to be searched for should render the warrant invalid. Nothing in the Fourth Amendment requires that a search be conducted as broadly as possible.

In any event, we need not decide finally whether the detective's error rendered the warrant invalid and the search unlawful.[5] Instead, we hold that, assuming the warrant was

derived from the illegal sales thereof, and
any personal papers or items to show standing.

[5] We therefore need not address the government's argument that the affidavit contained probable cause of assault with a dangerous weapon or similar crime, and that "illegally possessed" in the

invalid, the nature, effect, and cause of this particular type of assumed invalidity are such as to render the exclusionary rule inapplicable.

When a warrant issues without any probable cause of any crime, it results in a search that violates the subject's privacy and that would not have occurred but for the error. See Brinegar v. United States, 338 U.S. 160, 176 (1949) (probable cause principles "seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime"). Here, by contrast, had the error in labeling the criminal conduct described in the affidavit as illegal possession rather than assault with a deadly weapon not occurred, there still would have been a search, and that search would have been valid. And precisely that evidence which was found in the search challenged here would have been found in a valid search predicated on the crime of assault using a firearm.[6]

_____

warrant could be read to mean firearms possessed while using them illegally. See, e.g., United States v. Beckett, 321 F.3d 26, 32 & n.4 (1st Cir. 2003) (declining to decide whether warrant was supported by probable cause and instead affirming on basis of good faith under Leon).

[6] Although the search warrant also authorized a search for evidence related to illegal firearm "sales, manufacture, defacement, and distribution," and records or money derived from illegal sales, Monell does not argue that the officers found or seized any evidence under these clauses.

The Supreme Court has instructed that in order to "trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009); see also United States v. Leon, 468 U.S. 897, 920-21 (1984) (explaining that in most cases, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter"). No officer could have had any reason to deliberately make the error made here. The error arguably reduced the scope of the search from evidence of any firearm that might have been used to assault or batter a person to evidence of illegally possessed firearms only. To be blunt, if Detective Falandys were to encounter the exact same situation tomorrow, having first read our discussion of the deficiencies of the warrant, his likely reaction would be to draft a broader description of the items to be searched for, not a narrower one. See Horton v. California, 496 U.S. 128, 138 n.9 (1990) ("If the police have probable cause to search for a photograph as well as a rifle and they proceed to seek a warrant, they could have no possible motive for deliberately including the rifle but omitting the photograph. Quite the contrary is true. Only oversight or careless mistake would explain the omission

. . . ." (quoting Coolidge v. New Hampshire, 403 U.S. 443, 517 (1971) (White, J., concurring and dissenting)). And the exclusionary rule does not exist to punish such negligent, harmless mistakes by law enforcement. See Herring, 555 U.S. at 144 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."). Similarly, our holding gives no other officer any incentive to describe inaccurately a crime for which there is probable cause so as to obtain a warrant that casts no more broadly than would a properly targeted warrant. In short, were we to invoke the exclusionary rule in this case, we would neither deter culpable conduct nor reduce the incidence of intrusions that should not occur. Exclusion of the evidence found in such a case would therefore impose a price on the justice system in return for no meaningful gain in deterring the occurrence of searches that should not be conducted. See Davis v. United States, 131 S. Ct. 2419, 2427 (2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.").

Monell's only rejoinder is to point to case law like our recent decision in United States v. Cordero-Rosario, 786 F.3d 64(1st Cir. 2015), ordering the exclusion of evidence of child pornography seized under a warrant. In that case, we held that an officer's bald assertions that he was investigating "lewd acts," and that his investigation and interview with an injured minor led

him to believe the defendant stored pornography on his computer, did not justify a search of the defendant's apartment for pornography (illegal or otherwise). Id. at 70, 72-73. The affidavit suffered from "glaring deficiencies": there was simply no nexus between the crime made out in the affidavit and the object of the search (the defendant's computer), nor was there even probable cause to believe that the defendant engaged in any crime. Id. at 71-72. Accordingly, there was no basis at all to have searched the suspect's apartment or seized the computer. Id. at 72-73. Here, by contrast, the facts described in the affidavit provide probable cause to believe that a crime involving gun use had occurred, and that some evidence related to that crime was in "Ness's" apartment.

For these reasons, we agree with the district court that, assuming the invalidity of the warrant, the good-faith exception to the exclusionary rule applied to the evidence found in the apartment.

## B.   Batson Challenge to Peremptory Juror Strike

Monell next claims that the prosecutor exercised a peremptory juror challenge solely on the basis of race in violation of his equal protection rights as articulated in Batson v.

Kentucky, 476 U.S. 79 (1986).[7]  Batson established the following

three-part framework for evaluating such claims:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003) (citations

omitted) (citing Batson, 476 U.S. at 96-98).  "The opponent of a

strike bears the burden of proof throughout the inquiry."  United

States v. Girouard, 521 F.3d 110, 113 (1st Cir. 2008).  Our review

is for clear error.  Id. at 115.

The challenged strike was to Juror 19, who apparently

was the only African-American juror remaining in the venire at the

time of the strike.[8]  Juror 19 identified herself in response to

the district court's question to the venire about involvement in

criminal matters.  She recounted the "horrible experience" of being

falsely accused of a hit-and-run and being "treated with total

---

[7] Batson's holding applies to federal courts under the Fifth Amendment's Due Process Clause.  United States v. Girouard, 521 F.3d 110, 112 n.1 (1st Cir. 2008) (citing Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991)).

[8] The only other African-American juror in the venire was dismissed by the court for cause when he admitted unequivocally that he would have trouble being fair based on past negative encounters with the police.

disrespect by [a police] officer." The district court asked her, "[a]re you confident you could be fair to both sides? Are you hesitating?" Juror 19 admitted, "I'm hesitating. This experience, just knowing that truths weren't told by officers. I'm just being honest." Juror 19 later said that she would be fair to both sides, and, when asked if she would "take [a police] witness as he or she comes," responded affirmatively.

Later, the prosecutor used his second peremptory strike on Juror 19 when she was one of fourteen potential jurors placed in the jury box. Monell's counsel objected to the strike on the basis that Juror 19 was "the only African-American person left, I think, in the entire venire." Without making a finding that defense counsel established a prima facie case of discrimination, the district court invited a response. After accurately summarizing Juror 19's negative experience with the police, the prosecutor gave the following race-neutral reason for striking Juror 19: "She was, as she said, wrongly accused, and we believe she would have difficulty fairly judging the facts in this case given there are a number of police officers, many of whose credibility would be an important issue in this case given her own experience." The district court then denied Monell's Batson challenge:

> I'm going to accept that as a facially neutral reason for striking the juror. [Juror 19] certainly in my judgment did express her views

- 17 -

strongly about her experience and had some hesitation, concluding that she could be fair to both sides, and so I will accept the challenge as not violative of Batson or the Equal Protection Clause or otherwise illegal.

Assuming that Monell satisfied his initial burden of making a prima facie showing of discrimination, we have little trouble concluding that the district court did not clearly err in ruling that Monell failed to carry his ultimate burden of showing purposeful discrimination. Few trial lawyers would be eager to seat a juror who initially and explicitly expressed hesitation about her ability to be fair to counsel's side of the case. Furthermore, in gauging both the degree of the juror's potential bias and the credibility of the prosecutor's explanation, the district court was in a far better position than are we. See Snyder v. Louisiana, 552 U.S. 472, 477 (2008) ("[T]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor."). We discern no basis in the record for finding fault with the district court's on-the-ground determination.

Monell attempts to head off this conclusion by arguing, based on two cases citing studies of racial profiling by law enforcement, that allowing peremptory strikes on the basis of negative interactions with police will disproportionately exclude

- 18 -

African-American jurors.  Monell did not make this argument below, so we review it for plain error.  Girouard, 521 F.3d at 115. Neither the Supreme Court nor this court has held that disparate impact alone can sustain a Batson challenge, and Monell gives us no reason to think that the law nevertheless plainly so provides. See United States v. Charlton, 600 F.3d 43, 55 (1st Cir. 2010) (Lynch, C.J., concurring) (citing Hernandez v. New York, 500 U.S. 352, 362 (1991) (plurality opinion)); see also United States v. Perez, 35 F.3d 632, 635 (1st Cir. 1994) ("[A]n explanation may be 'race neutral' even though it does not produce uniform results across racial lines.").  Moreover, the challenge here did not arise simply because the juror reported a negative interaction with police from which one might infer an unwillingness to believe other police officers.  Here, the juror herself was not certain that such an inference would be inaccurate.[9]

## C.    Admissibility of Government Expert Testimony

### 1.    Helpfulness to the jury

Monell next challenges the admissibility of testimony by government expert witness Detective Gary Mercurio ("Detective Mercurio") that evidence found in the apartment was consistent

---

[9] Monell also attempts to contrast the government's strike of Juror 19 with his unsuccessful attempt to challenge a white juror, Juror 12, for cause.  The contrast is an illusion, however: the government also used a peremptory strike on Juror 12.

with drug dealing. Monell's primary claim is that some of Detective Mercurio's testimony did not "help the trier of fact to understand the evidence or to determine a fact in issue," as required for expert testimony by Federal Rule of Evidence 702(a). In particular, Monell challenges the following four pieces of Detective Mercurio's testimony: (1) that drug dealers "tend to have other people rent the residences that they use . . . . so that their name is not associated with that residence;"(2) that drug dealers tend to have multiple cell phones "to protect their identity;" (3) that "drug dealers want to protect their product and their money so they use firearms to do that;" and (4) that a piece of wood mounted against the apartment door was a barricade, which drug dealers "use[] to stop other people from taking the product from that dealer and also to slow down or stop law enforcement."

Monell objected to the first three parts of Detective Mercurio's testimony, but not the fourth part about the barricade.[10] Because Monell's claim fails even if he had objected

---

[10] The government argues that Monell did not preserve his objections to any of the challenged parts of Detective Mercurio's testimony because defense counsel merely stated "[o]bjection" without articulating specific grounds. See Fed. R. Evid. 103(a)(1)(B). We are not so sure that the grounds for the objection were not "apparent from the context." Id. Monell filed a pretrial motion in limine to exclude Detective Mercurio's testimony about "the modus operandi of drug distribution on the basis of the evidence seized" on Rule 702(a) grounds, which the district court denied provisionally. Although the motion in limine alone did not

to the barricade testimony, we treat his challenge to all four pieces of testimony as preserved. We review preserved challenges to the admission of expert testimony for abuse of discretion. United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001).

The challenged testimony helped the jury decide whether Monell operated like a drug dealer, not a user, by taking steps to conceal his activities and protect a large quantity of drugs. This court has repeatedly found no abuse of discretion in the admission of similar expert testimony to explain the typical methods of drug dealers. See, e.g., United States v. Hicks, 575 F.3d 130, 144 (1st Cir. 2009) (officer's expert testimony that guns are prevalent among Brockton drug dealers and about practice of concealing or swapping firearms was admissible); United States v. Lopez-Lopez, 282 F.3d 1, 14 (1st Cir. 2002) (use of GPS and cell phones to import drugs by sea). Detective Mercurio's testimony about multiple cell phone use and using the names of others to rent apartments was also directly relevant to address Monell's claim that he only lived in the apartment sporadically, and that the drugs and gun could have belonged to others residing in the apartment. Given the "considerable latitude" the district court enjoys in deciding whether expert testimony is helpful to the jury,

---

preserve Monell's claimed error, it did alert the district court and prosecutor to his grounds for exclusion at trial. We need not decide this issue, however, because Monell's claim of error fails even if preserved.

<u>Sebaggala</u>, 256 F.3d at 65, we cannot say that the district court abused its discretion here.

##### 2. Opinion on culpable mental state

Monell also argues that Detective Mercurio impermissibly opined on Monell's culpable mental state, the intent to distribute. <u>See</u> Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."). Monell takes issue with the following exchange:

> [Prosecutor]: All right. Detective Mercurio, based on your review of all of the items in this case, have you formed an opinion if the items are more consistent with drug distribution or personal use of the items? Have you formed that opinion?
>
> [Detective Mercurio]: Yes.
>
> [Prosecutor]: What is your opinion?
>
> [Defense counsel]: Objection.
>
> [Court]: Overruled.
>
> [Detective Mercurio]: Based on, you know, the barricade on the door, the firearm being right next to the door, you know, three -- you have three digital scales, basically three different size digital scales, a small one, you know, like I said, you have the firearm, you have 37, in my opinion, 37 bags, $40 bags. No user would buy 37 $40 bags.

When the prosecutor asked Detective Mercurio to explain his last comment, the detective clarified that it would not be economical

- 22 -

for a user to buy that amount of drugs in street-level, rather than bulk, quantities.

Monell now argues that the "[n]o user would buy 37 $40 bags" statement, combined with the recitation of the evidence of distribution, amounted to an inadmissible expert opinion on his mental state.[11]  Though Monell objected, it is clear from the transcript that he objected on different grounds.  Just before the exchange quoted above, the prosecutor attempted to ask the same question to elicit Detective Mercurio's opinion about drug distribution, at which point defense counsel objected on the basis that the testimony would be outside Detective Mercurio's expertise, but did not object on Rule 704(b) grounds.[12]  Because

---

[11] In his reply brief, Monell also challenges on Rule 704(b) grounds Detective Mercurio's testimony that certain pieces of evidence were consistent with drug distribution.  Because this argument debuted in his reply brief, it is waived. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000) ("We have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived.").

[12] Defense counsel objected as follows:

> Beyond the objections that his testimony that that is not consistent with personal use, he may have been qualified as an expert with respect to whether this is consistent with distribution, but he has no basis in his education or training with respect to addiction, with respect to use, and so for him to offer an opinion that it's not consistent with personal use goes beyond his expertise and his training and for that reason should be excluded.

- 23 -

Monell did not object on the basis he now presses on appeal, our review is for plain error. See United States v. Iwuala, 789 F.3d 1, 5, 7 (1st Cir. 2015) (citing Fed. R. Evid. 103(a)(1)).

It is by no means obvious that Detective Mercurio's comment that "[n]o user would buy 37 $40 bags" of crack cocaine was an opinion of Monell's mental state.  Rather it was simply an observation that drug users do not buy large quantities in bulk in street-level units.  While it is true that a jury might in turn infer something about Monell's purpose in possessing the drugs, that is precisely how one proves intent in crimes where it is relevant (and no admission is available).  In short, if there was error here, then it certainly was not plain. See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (plain error review requires, among other things, a "clear or obvious" error).

---

In one sentence of his reply brief, Monell repeats this objection to Detective Mercurio's testimony.  To the extent that Monell seeks to challenge on appeal Detective Mercurio's qualifications, he waived that challenge by waiting until his reply brief to raise it, see Waste Mgmt. Holdings, Inc., 208 F.3d at 299, and then doing so perfunctorily, see Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

## D. Admissibility of Rebuttal Evidence

Monell next claims that the district court erred in ruling that the government could introduce recorded prison conversations as rebuttal evidence if Monell called Tommy Nguyen as a defense witness.

Shortly before trial, Monell filed a proposed witness list containing three witnesses, including his girlfriend, Nicole Connally. Three days later and one week before trial, Monell added Nguyen as a fourth proposed witness. At the government's request, the district court agreed to appoint counsel for Connally and Nguyen because of the possibility that those two witnesses might incriminate themselves by placing themselves in the apartment. Before the end of the government's case-in-chief, the district court conducted a voir dire of both Connally and Nguyen to determine the scope of their testimony and whether they would assert their Fifth Amendment privilege against self-incrimination. Connally validly asserted her Fifth Amendment privilege, and the district court excused her.

Nguyen, on the other hand, agreed to waive in part his Fifth Amendment privilege, and refused to answer questions only about whether he owned or directly possessed the guns, ammunition, or drugs found in the apartment. During voir dire, Nguyen testified that he had lived in the apartment at 696 North Main Street for about two months before the police conducted the search;

that he allowed Monell to stay in the apartment five or six times; and that Nguyen had seen the handgun, shotgun, and ammunition in the apartment before Monell stayed there for the first time. He also denied seeing Monell possess drugs in the apartment. Nguyen stated that he and Monell were members of the Bloods street gang, but denied knowing about Monell's role in the gang.

The district court deferred ruling on the admissibility of Nguyen's testimony and any rebuttal evidence until later that day. In the meantime, the government made it clear that, if Nguyen testified, it would seek to introduce as rebuttal evidence an audio recording of a June 15, 2013, prison conversation, recorded while Monell was in pretrial detention, during which Monell seemingly attempted to convince Connally, with whom he shared a child, to take responsibility for the crime.[13] The government argued that

---

[13] The following excerpts from the transcript of the prison conversation provide a flavor of the exchange between Monell and Connally:

> Monell: End of the day, you got to think about it. Think. I will never know. I will never opportunity [sic] for shit. I will be 55, and I come home with 5 years parole. So, they gonna be on my ass for 25. So, think. Don't think now. Think about everything later on. Get it?
> . . . .
> Connally: . . . . Throw my name out there. See what happens. If you haven't already.
> . . . .
> Connally: I said what you feel deep down inside when it comes to me about the

the recording supported an inference that Monell also pressured Nguyen to testify falsely as a backup plan when Connally refused.[14] Monell objected, arguing that the prison conversation between Monell and Connally was not relevant to Nguyen's decision to testify. Defense counsel also asked the district court to rule on the admissibility of the rebuttal evidence before defense counsel made a decision on whether to call Nguyen.

After the government finished its case-in-chief, the district court ruled that it would admit Nguyen's testimony notwithstanding his partial exercise of his Fifth Amendment privilege against self-incrimination, "if this testimony plays out as I expect it and as conducted in the voir dire." The district

---

situation.
Monell: That's not true. . . . It's that I figured I would go to--I would do what I would do for you if there's the mathematics. This is about mathematics. Like, last time I was out there, [Marvin] said, "Listen, if we get pulled over, I'm taking this for you." That's what my people do for me.
. . . .
Monell: Like I said, end of the day, you gotta do you now because if you don't do it, I'm done. . . . 20 years? Do you know what that is? You think one year was a lot? You gotta do you now.

[14] In a transcript of a different prison conversation produced by the government at sentencing, but not during the trial, Monell told Connally, "I'm a let you go with all of that and I'm a move on, I go to my plan B now that's all I can do." See infra section II.E.

court also stated that if Nguyen testified, evidence that Nguyen and Monell were members of the Bloods street gang could come in, and "may open the door toward other gang-related evidence," including photographs and gang-colored clothing found in the apartment. The district court explained that it would delay a "final ruling" on the admissibility of the prison recording until after Monell put on his other evidence, but the court indicated that "if Nguyen does testify," the recording would be admissible. The district court confirmed this inclination after Monell presented his other evidence, predicting that "my ruling will be that if [Nguyen] testifies, I will permit the government to introduce the transcript or the tapes rather from June 15th, 2013." The district court then made conditional rulings about redacting statements in the recording about Monell's pretrial detention and predicted prison sentence. After defense counsel conversed with Monell, the defense rested without calling Nguyen as a witness.

On appeal, Monell argues that the recorded prison conversation was inadmissible as irrelevant and unfairly prejudicial, see Fed. R. Evid. 402, 403, and that the district court's ruling to the contrary violated his Sixth Amendment right to call witnesses in his defense. We do not reach the merits of Monell's argument, however, because Monell waived his challenge by not calling Nguyen as a witness.

Our conclusion that Monell waived his challenge flows from the reasoning in Luce v. United States, 469 U.S. 38 (1984). In Luce, the defendant sought to challenge the district court's denial of his motion in limine[15] to prevent the government from impeaching him, if he testified, with a prior conviction under Federal Rule of Evidence 609(a).  469 U.S. at 39-40.  The Supreme Court held that the defendant's challenge was not reviewable because he decided not to testify and the challenged evidence therefore did not come in.  Id. at 43.  The Court identified several reasons why this must be so: (1) the lack of factual context made it difficult for a reviewing court to balance probative value and unfair prejudice; (2) the district court's in limine ruling was subject to change until the evidence was actually offered; (3) the government ultimately might not use the objectionable impeachment evidence; (4) the defendant might have chosen not to testify even without the adverse ruling; and (5) harmless error analysis would be an empty exercise because "the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying."  Id. at 41-42. Though Luce involved a challenge to a Rule 609(a) ruling, we have

---

[15] The Court in Luce used the term "in limine" "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered."  Luce, 469 U.S. at 40 n.2.  Monell's objection to the government's anticipated rebuttal evidence fits within this broad definition.

extended its reasoning to other in limine evidentiary rulings, including those under Rule 403. See United States v. Griffin, 818 F.2d 97, 104 (1st Cir. 1987).

The concerns animating Luce counsel against appellate review here. We would need to make too many speculative assumptions to rule on Monell's claim. First, and most significantly, Nguyen's testimony might not have made it into evidence. The district court made the admissibility of Nguyen's testimony contingent on his trial testimony conforming to his voir dire. The district court acknowledged the possibility that Nguyen's actual testimony might differ from his voir dire: "I, of course, don't know how precisely this is going to play out. I'm sort of guessing how this is going to play out . . . ." Had Nguyen refused to answer all or most of the government's questions on cross-examination, the district court could have stricken Nguyen's testimony. See United States v. Gary, 74 F.3d 304, 310 (1st Cir. 1996) ("When cross-examination on material issues raised on direct examination is curtailed because of a witness's valid claim of privilege . . . the trial court, in its discretion, may refuse to permit that witness's testimony.").

Second, we would also need to assume that Monell would have called Nguyen if not for the district court's ruling on the recorded prison conversation. There are at least two other reasons Monell might have had for keeping Nguyen off the stand. One would

be to keep the lid shut on evidence about Monell's shared street gang affiliation with Nguyen. The other was that, after hearing Nguyen's voir dire, Monell might have decided that the jury would not believe Nguyen, regardless of the government's cross-examination or rebuttal evidence.[16]

Third, the government might have elected not to risk a reversible appellate issue, and ultimately might have decided not to introduce the prison recording. This possibility would have become more likely if Nguyen's testimony suffered from internal inconsistencies, or if the government was able to put in all of the evidence of gang affiliation. Furthermore, had the government introduced the recording, we do not know to what extent the statements in the recording would have been redacted, which makes it difficult to evaluate the degree of unfair prejudice Monell would have suffered.

Appellate review of an evidentiary ruling, especially a Rule 403 ruling, cannot bear this level of speculation. Thus, if Monell wished to challenge the admissibility of the rebuttal evidence, he should have called Nguyen, put his testimony before the jury (and cemented it into the record), objected if and when

---

[16] In particular, Nguyen's story during voir dire that he stayed with a friend the night before the search, then, upon returning the next morning, did not enter his own apartment, instead remaining on the stairwell for several hours, could have struck the jury as unbelievable.

- 31 -

the government sought to introduce the prison recording, and then appealed the ruling if the district court overruled his objection. See, e.g., Aguirre v. Turner Constr. Co., 582 F.3d 808, 814 (7th Cir. 2009) ("When a judge makes a conditional ruling on evidence, the party objecting to it must satisfy the condition if he wants to preserve the issue for appellate review."). True, Monell would have run the risk that we would affirm the admission of the rebuttal evidence, but parties must engage in this sort of calculus all of the time. Cf. Ohler v. United States, 529 U.S. 753, 757-59 (2000) (discussing the choices defendants with prior convictions face in deciding whether to testify).

Our approach to this issue presents no unfairness to Monell or to other defendants in similar positions. Monell points us to no trial management rule that required the prosecution to tell Monell before he called Nguyen what the prosecution would do on rebuttal. Nor did the district court have a duty to preview its likely ruling. If we were now to rule that those discretionary disclosures--all to Monell's benefit--also conveyed the advantage of challenging an evidentiary ruling that was never actually made, the likelihood of such disclosures would drop. We think it fairer to all to presume that providing a defendant with more information does not itself alter the rules on waiver to his advantage.

Monell points to cases in which we have suggested in dicta that a defendant could avoid the Luce waiver rule by

screening the proposed testimony voir dire, thereby providing a "verisimilitudinous enactment of an actual context," rather than putting it before the jury. Griffin, 818 F.2d at 105 ("[C]ounsel may request . . . in exceptional cases, that the actual testimony be screened voir dire in the jury's absence." (emphasis added)); see also United States v. Nivica, 887 F.2d 1110, 1116 (1st Cir. 1989) (quoting Griffin). We do not rule out the possibility that a sufficiently definite preview of the defendant's and the government's proposed evidence could provide a "verisimilitudinous enactment of an actual context," Griffin, 818 F.2d at 105, such that the district court and appellate court can rule without the disadvantages listed in Luce. Here, though, for all the reasons we have already listed, no such enactment occurred (or was likely possible).

Finally, our recent decision in United States v. Jimenez-Bencévi, 788 F.3d 7 (1st Cir. 2015), does not dictate a different result. In Jimenez-Bencévi, the district court required the defendant to reveal to his proposed expert the defendant's proffer of an admission of guilt during plea negotiations with the government. Id. at 13-14. That proffer was protected by direct use immunity granted in a written proffer agreement. Id. at 10. The defendant did not call the expert, and on appeal sought to argue that the district court violated his proffer agreement. Id. at 14. We held that the defendant did not waive this challenge,

even though he did not put the expert on the stand. Id. at 15. There are several reasons why Jimenez-Bencévi does not control here. The ruling at issue in Jimenez-Bencévi unconditionally required the defendant to violate his proffer agreement as a precondition to calling his expert, rather than as a down-the-road ramification of calling the expert. In addition, the district court in Jimenez-Bencévi effectively excluded the defendant's expert, because it concluded that "the expert would likely recant upon learning of the proffer; and if he did not, the court would not allow him to testify." Id. Simply put, in Jimenez-Bencévi it was abundantly clear that because of the challenged ruling, the defendant could not call his expert, and certainly could not do so without violating his proffer agreement, whereas we are left to guess how events would have transpired in the district court had Monell called Nguyen.

**E.    Sentencing Challenge**

Monell's final challenge is to his prison sentence. The district court sentenced Monell to a total of 262 months in prison. This sentence was at the bottom of the applicable guidelines sentencing range of 262 to 327 months and well below the 324 months recommended by the government. Monell's status as an armed career criminal set his guidelines sentencing range by requiring an offense level of 34 and criminal history category of VI. See 18 U.S.C. § 924(e); U.S.S.G. § 4B1.4.

The district court cited several reasons for imposing a guidelines sentence above the statutory minimum: "an extensive criminal record of violent offenses," and findings "that [Monell] has gang membership and affiliation, that he has attempted to obstruct justice, [and] that he engaged in serious post offense conduct," namely, using a manufactured weapon during a prison riot and attacking corrections officers with a mesh bag full of broken tiles. Monell challenges on appeal only the finding that he attempted to obstruct justice, arguing that "selecting a sentence based on clearly erroneous facts" would be procedural error, Gall v. United States, 552 U.S. 38, 51 (2007).

The district court found that Monell attempted to obstruct justice by trying to persuade Connally and Nguyen to testify falsely and accept responsibility for his criminal conduct.[17] To make the obstruction of justice finding, the district court relied primarily on transcripts of recordings of prison conversations between Monell and Connally, one of which was the conversation the government intended to use as rebuttal evidence at trial.[18] Despite the sometimes cryptic nature of the

---

[17] The district court made the two findings of attempted obstruction in the context of deciding that an obstruction of justice enhancement would apply. See U.S.S.G. § 3C1.1. The obstruction of justice enhancement ultimately had no effect on Monell's sentence, but the district court later cited its obstruction finding in selecting Monell's sentence within the guideline range.

[18] In addition to the June 15, 2013, conversation the government

conversations, the transcripts support a reasonable inference that Monell attempted to get Connally to claim responsibility for at least some of the criminal conduct.  See supra notes 13-14.  Monell argues that a reasonable interpretation of the conversations was that Monell wanted Connally to tell the truth by claiming possession of the drugs.  Even if we assume such an interpretation was reasonable, "[w]here there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous."  United States v. D'Andrea, 107 F.3d 949, 958 (1st Cir. 1997).[19]

In Nguyen's case, the district court's apparent finding was that Monell persuaded Nguyen to inferentially accept responsibility by testifying that he owned the apartment at issue and that he had seen guns in the apartment prior to Monell's staying there. While it is not clear that the district court relied on this finding, even if it did, this finding, too, was not clearly erroneous.  The district court acknowledged "gaps in the story" connecting Monell to Nguyen, but cited several pieces of evidence

_____

had offered at trial, the government also produced a transcript of a July 15, 2013, conversation between Monell and Connally during sentencing proceedings.

[19] Nor does it matter that defense counsel, in summarizing Connally's expected testimony, stated an intention not to ask her whether she engaged in criminal activity.  What does matter is Monell's attempt (even if unsuccessful) during the prison conversations to pressure Connally into taking the fall for him.

supporting an inference of obstruction: the transcripts of the prison conversations; Nguyen's late appearance as a witness; Nguyen's "not credible" testimony on voir dire; and the shared gang affiliation.  In particular, in a recording of a second prison conversation that the government cited for the first time during sentencing, Monell told Connally: "what you went through was state law[,] totally different animal but like I said I'm not gonna get into it[.] . . . I'm a let you go with all of that and I'm a move on, I go to my plan B now that's all I can do."  (emphasis added)  Given that Monell had a backup plan if Connally would not take the fall, and that Nguyen later showed up with a not credible attempt to take the fall for Monell, a reasonable inference could be made that Nguyen was "plan B," even if a competing inference is possible.  See id.  The district court therefore did not rely on a clearly erroneous factual finding in selecting Monell's sentence.

## III.  Conclusion

For the foregoing reasons, we affirm Monell's convictions and sentence.